**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| **BRENDA C. RICE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:10cv00045 |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Brenda C. Rice, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423. (West 2003 & Supp. 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Rice protectively filed her application for DIB on November 1, 2006, alleging disability as of October 30, 2006, due to diabetes, hepatitis A, a left hand problem due to a prior severe laceration, nervousness, tuberculosis germ, difficulty breathing and back pain. (Record, ("R."), at 87-89, 94, 104, 112.) The claim was denied initially and on reconsideration. (R. at 43-45, 50, 52-54, 56-58.) Rice then requested a hearing before an administrative law judge, ("ALJ"). (R. at 59.) The hearing was held on January 8, 2008, at which Rice was represented by counsel. (R. at 21-40.)

By decision dated February 28, 2008, the ALJ denied Rice's claim. (R. at 12-20.) The ALJ found that Rice met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2008.[1] (R. at 14.)  The ALJ also found that Rice had not engaged in substantial gainful activity since October 30, 2006, the alleged onset date. (R. at 14.)  The ALJ determined that the medical evidence established that Rice had severe impairments, namely obesity, disc bulge, diabetes mellitus and hearing loss, but she found that Rice's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R.

---

[1] Because Rice met the insured status requirements of the Act for DIB purposes through December 31, 2008, she must establish that she became disabled on or before this date last insured.

Part 404, Subpart P, Appendix 1. (R. at 14-16.) The ALJ also found that Rice had the residual functional capacity to perform simple, routine, unskilled repetitive light[2] work that required no more than occasional handling with the left nondominant hand, that did not require work around hazardous machinery, unprotected heights, vibrating surfaces or loud background noise, that required no climbing of ladders, ropes or scaffolds and that required no more than occasional interaction with the general public. (R. at 16.) The ALJ found that Rice was unable to perform her past relevant work as a housekeeper. (R. at 18.) Based on Rice's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that other jobs existed in significant numbers in the national economy that Rice could perform, including those of a housekeeper, a general office clerk and a janitor/building cleaner, all at the light level of exertion. (R. at 19.) Thus, the ALJ found that Rice was not under a disability as defined under the Act and was not eligible for benefits. (R. at 19-20.) *See* 20 C.F.R. § 404.1520(g) (2010).

After the ALJ issued her decision, Rice pursued her administrative appeals, (R. at 8), but the Appeals Council denied her request for review. (R. at 1-4.) Rice then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2010). The case is before this court on Rice's motion for summary judgment filed February 25, 2011, and the Commissioner's motion for summary judgment filed March 28, 2011.

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2010).

## II. Facts[3]

Rice was born in 1954, (R. at 87), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Rice has a ninth-grade education[4] and past relevant work experience as a housekeeper. (R. at 25, 113.) She testified that she stopped working in November 2006 due to physical problems. (R. at 25-26.) She testified that her "nerves" prevented her from being around people and that she had experienced daily panic attacks for the previous year. (R. at 27, 32.) Rice described these panic attacks as her heart racing and feeling weak and like she would pass out. (R. at 32.) She stated that these attacks were especially triggered when around people. (R. at 32.) Rice testified that she had been seeing a counselor for about a year on a monthly basis and that she was taking Lexapro. (R. at 27-28.) She described her daily activities to include light housekeeping and watching television. (R. at 29.) Rice testified that she had difficulty concentrating, but she denied ever having been hospitalized for any mental difficulties. (R. at 29, 32.)

AnnMarie E. Cash, a vocational expert, also was present and testified at Rice's hearing. (R. at 34-39.) Cash classified Rice's work as a housekeeper as

---

[3] Because Rice challenges on appeal only the ALJ's findings with regard to her mental impairments, facts relating to Rice's physical impairments are included, if at all, for clarity of the record only.

[4] A limited education means ability in reasoning, arithmetic and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semiskilled or skilled work. A seventh-grade through eleventh-grade education is considered a limited education. *See* 20 C.F.R. § 404.1564(b)(3) (2010).

medium[5] and unskilled. (R. at 35.) When asked to assume a hypothetical individual of Rice's age, education and work history who could perform simple, routine, repetitive, unskilled light work requiring no more than occasional climbing, balancing, kneeling, crawling, stooping, crouching and handling with the left nondominant hand, which did not require working around hazardous machinery, temperature extremes, unprotected heights, vibrating surfaces or loud background noise, which did not require climbing ladders, ropes or scaffolds, and which required no more than occasional interaction with the general public, Cash testified that the individual could not perform Rice's past relevant work as a housekeeper as performed or as generally performed. (R. at 35-36.) However, Cash testified that such an individual could perform other jobs existing in significant numbers in the national economy, including those of a housekeeper, a general office clerk and a janitor/building cleaner, all at the light level of exertion. (R. at 36.) When asked to consider the same individual, but who also had the limitations set forth in the October 2007 psychological evaluation and mental assessment performed by Ramsden and the December 2007 mental assessment performed by Burke, (R. at 257-65, 271-73), Cash testified that such an individual could perform no jobs. (R. at 37.)

In rendering her decision, the ALJ reviewed records from Buchanan County Health Department; Family Care Center; Dr. Clinton Sutherland, M.D.; Buchanan General Hospital; Dr. Ravi K. Titha, M.D.; Dr. Michael Hartman, M.D., a state agency physician; Dr. Richard Surrusco, M.D., a state agency physician; Stone

---

[5] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2010).

Mountain Health Services, ("Stone Mountain"); Crystal Burke, L.C.S.W.; Mary Ann Collins, N.P.; and Ralph Ramsden, Ph.D., a licensed clinical psychologist. Rice's counsel submitted additional medical records from Ramsden; Buchanan General Hospital; Stone Mountain; and Burke to the Appeals Council.[6]

When Rice was seen at Family Care Center on November 3, 2006, December 6, 2006, and January 9, 2007, she was alert and oriented, and her affect was appropriate. (R. at 186, 204, 206, 208.) Rice saw Dr. Ravi K. Titha, M.D., for a consultative examination on February 18, 2007. (R. at 217-22.) At that time, Rice denied any depression or anxiety. (R. at 218.) She was pleasant and cooperative. (R. at 219.) Her appearance, behavior, speech, thought processes and thought content were normal. (R. at 220.) Rice's mood and affect were normal, and her sensory and cognition were equal. (R. at 220.) Concentration and attention were normal, as were her attitude and degree of cooperation. (R. at 220.) Her persistence and pace were normal, and her fund of information was adequate. (R. at 220.)

When Rice completed a Personal History Form at Stone Mountain on May 2, 2007, she reported nervousness. (R. at 255.) She was fully oriented and had normal memory, mood, affect and judgment/insight. (R. at 252.) On June 19, 2007, Rice reported that she had an appointment with a counselor. (R. at 248.) Again, she was fully oriented with normal memory, mood, affect and

        [6] Since the Appeals Council considered these records in deciding not to grant review, (R. at 1-4), this court also must consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

judgment/insight. (R. at 249.) Rice was diagnosed with depression, and Elavil was prescribed. (R. at 250.)

Rice saw Crystal Burke, L.C.S.W. at Stone Mountain, for counseling on July 5, 2007. (R. at 241.) She reported being very frustrated and anxious, noting multiple family and situational stressors, including financial difficulties and her husband's and sister's poor health. (R. at 241.) Rice denied suicidal or homicidal ideation. (R. at 241.) She appeared alert and oriented, her memory appeared intact, her mood appeared depressed, and she was tearful at times during the interview. (R. at 241.) Burke assessed Rice as having some problems with depression and anxiety, for which she discussed coping strategies and allowed Rice to "vent." (R. at 241.)

On July 16, 2007, and again on October 12, 2007, when Rice was seen at Stone Mountain, she was fully oriented with a normal memory, mood and affect and judgment/insight. (R. at 243, 246.) She was again diagnosed with depression. (R. at 244, 247.) On October 4, 2007, Rice returned for counseling with Burke. (R. at 240.) She again reported stress due to her husband's health and her sister's illness. (R. at 240.) She reported that she was taking Lexapro, which was helping some with crying episodes and motivation issues. (R. at 240.) However, she noted continued difficulty sleeping. (R. at 240.) Rice denied suicidal or homicidal ideation. (R. at 240.) She was alert and oriented with intact memory. (R. at 240.) She initiated conversation, but her mood appeared depressed, and her thought content included some depressive features. (R. at 240.) Burke noted that Rice appeared to benefit from Lexapro and supportive counseling. (R. at 240.) However, she further noted that Rice continued to report and exhibit some

depressive symptoms.  (R. at 240.)  Burke again discussed coping strategies and allowed Rice to vent.  (R. at 240.)

Ralph Ramsden, Ph.D., a licensed clinical psychologist, completed a psychological evaluation of Rice on October 23, 2007.  (R. at 257-62.)  Rice was mildly anxious with a rather hesitant interactional style.  (R. at 257.)  She appeared to have no difficulty comprehending information presented to her orally, and she actively participated in the evaluation.  (R. at 257.)  She was fully oriented and attended well throughout the evaluation.  (R. at 257.)  Ramsden noted no evidence of a thought disorder, and he opined that Rice was of at least low average to above in intelligence.  (R. at 257.)  She further reported that her husband and sister both were ill.  (R. at 259.)  Rice denied any history of mental health counseling, noting that she began taking Lexapro for two months for depression.  (R. at 258, 260.)  She reported some anxiety for as long as she could remember, stating that she "just [could not] sit still.  (R. at 260.)  She reported daily worry about money and her family's health, noting that her worry had increased dramatically recently.  (R. at 260.)  She further reported difficulty concentrating over the previous two years.  (R. at 260.)  Rice attributed her worsening symptoms to recent family health issues, noting several family deaths over the previous six years.  (R. at 260.)  She reported experiencing panic attacks for the previous year which lasted from 10 to 15 minutes and which she described as "get[ting] real nervous.  I can't sleep.  I can't lay down.  My heart is pounding real hard and it feel like I'm going to cry."  (R. at 260-61.)  Although Rice stated that these were occurring more frequently, she had difficulty specifying the frequency.  (R. at 261.)  She did note that they occurred mostly at night.  (R. at 261.)  Rice reported experiencing depression four days per week, but she denied suicidal or homicidal ideation.  (R. at 261.)  She

described herself as socially withdrawn, not wanting to be around crowds. (R. at 261.) She denied any history of hallucinations or delusions. (R. at 261.)

The Miller Forensic Assessment of Symptoms Test, ("M-FAST"), indicated that Rice did not appear to be exaggerating clinical symptoms. (R. at 261.) Ramsden diagnosed adjustment disorder with mixed features of anxiety and depression; and anxiety disorder, not otherwise specified, with panic symptoms. (R. at 262.) Rice's then-current Global Assessment of Functioning, ("GAF"), score[7] was assessed at 50.[8] (R. at 262.)

On October 27, 2007, Ramsden also completed an Assessment Of Ability To Do Work-Related Activities (Mental), finding that Rice had an unlimited/very good ability to understand, remember and carry out simple job instructions, a good ability to follow work rules, to relate to co-workers, to interact with supervisors, to understand, remember and carry out detailed, but not complex, job instructions and to maintain personal appearance. (R. at 263-65.) Ramsden also found that Rice had a fair ability to deal with the public, to use judgment, to function independently, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability and a poor ability to deal with work stresses. (R. at 263-64.) Ramsden opined that Rice could

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 41 to 50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

manage benefits in her own best interest and that she would miss about two days of work monthly.  (R. at 265.)

Burke completed an Assessment Of Ability To Do Work-Related Activities (Mental) on December 4, 2007, finding that Rice had a good ability to follow work rules and to maintain personal appearance.  (R. at 271-73.)  She found that Rice had a poor ability to deal with work stresses and to understand, remember and carry out detailed and complex job instructions.  (R. at 271-72.)  In all other areas, Burke opined that Rice maintained a fair ability.  (R. at 271-72.)  She further opined that Rice could manage benefits in her own best interest and that she would miss more than two work days monthly.  (R. at 273.)  In support of her findings, Burke listed Rice's depression and anxiety.  (R. at 271-72.)

When Rice saw Burke for counseling on March 4, 2008, she reported feeling very down and that she was having some significant stress with her family, noting worry over her husband's poor health, as well as her own health issues.  (R. at 295.)  She reported continuing to take Lexapro, which she felt was not helping.  (R. at 295.)  Rice reported feeling very panicky and anxious.  (R. at 295.)  She was alert and oriented, and she had fair hygiene and grooming.  (R. at 295.)  Rice was tearful, and her mood appeared depressed and anxious.  (R. at 295.)  Burke noted Rice's ongoing situational family and medical stressors, and she discussed coping strategies and allowed Rice to vent.  (R. at 295.)  On May 6, 2008, Rice reported that she had not been feeling well, and she again noted stress over her husband's and sister's poor health.  (R. at 294.)  She again reported her belief that Lexapro was not helping.  (R. at 294.)  However, she denied suicidal or homicidal ideation.  (R. at 294.)  Rice was alert and oriented, her hygiene and grooming were fair, her

mood was depressed, and she was tearful at times during the interview.  (R. at 294.)  Burke stated that Rice appeared to be overwhelmed with mental stressors and that she "apparently ha[d] very poor coping strategies."  (R. at 294.)  Burke discussed coping strategies and provided support.  (R. at 294.)

That same day, Rice saw Mary Ann Collins, a nurse practitioner at Stone Mountain.  (R. at 304-06.)  Rice reported receiving some bad news concerning her husband's health.  (R. at 304.)  She continued to complain of anxiety and insomnia.  (R. at 304.)  Rice was oriented with normal memory, mood, affect and insight/judgment.  (R. at 305.)  Collins diagnosed anxiety, and she prescribed Elavil.  (R. at 306.)

Rice again saw Ramsden on May 29, 2008, for a second psychological evaluation.  (R. at 279-82.)  At that time, she was mildly anxious, but actively participated in the evaluation.  (R. at 279.)  She had no difficulty comprehending information or expressing herself orally or in written information.  (R. at 279.)  She was fully oriented and had no features of a thought disorder.  (R. at 279.)  Rice noted that her husband's health had continued to deteriorate and that she was experiencing more panic attacks.  (R. at 280.)  She further reported that she had been prescribed BuSpar for anxiety, in addition to continuing to take Lexapro.  (R. at 280.)  She reported significant financial stress.  (R. at 280.)  Despite continued mental health counseling on a monthly basis, Rice believed that her symptoms of anxiety had worsened, noting difficulty sleeping and panic attacks occurring two to three times daily when at home with her husband.  (R. at 280.)  She noted that her panic attacks were not as frequent when she was not at home taking care of her husband.  (R. at 280.)

The Structured Inventory of Malingering Symptoms, ("SIMS"), indicated the presence of some mild exaggeration of the severity of Rice's depression. (R. at 281.) However, the Personality Assessment Inventory, ("PAI"), indicated no tendency to exaggerate or minimize symptoms. (R. at 281.) Clinical elevations were noted for depression and anxiety. (R. at 281.) Overall, Ramsden noted that while the objective testing displayed mild tendencies to exaggerate problems, Rice generally gave a honest self-description on the PAI. (R. at 282.) He further noted that personality test results revealed an individual who was experiencing significant depression and anxiety, which was negatively affecting her thinking, her moods and her physical functioning. (R. at 282.) Ramsden diagnosed depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; and a then-current GAF score of 45. (R. at 282.)

On June 5, 2008, Ramsden completed another Assessment Of Ability To Do Work-Related Activities (Mental), finding that Rice had an unlimited/very good ability to understand, remember and carry out simple job instructions and a good ability to follow work rules, to relate to co-workers, to interact with supervisors, to understand, remember and carry out detailed job instructions and to maintain personal appearance. (R. at 283-85.) He further found that she had a fair ability to deal with the public, to use judgment, to function independently, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner and to relate predictably in social situations and a poor ability to deal with work stress and to demonstrate reliability. (R. at 283-84.) Ramsden opined that Rice could manage benefits in her own best interest and that she would be absent from work more than two days monthly. (R. at 285.)

When Rice again saw Burke on December 2, 2008, she reported that she had been very down despite taking Lexapro, BuSpar and Elavil. (R. at 293.) She reported more stress at home, as her husband was very sick and being considered as a candidate for dialysis. (R. at 293.) She further reported her own continuing health problems. (R. at 293.) Rice denied any suicidal ideations. (R. at 293.) She appeared alert and oriented, her hygiene and grooming were fair, her mood appeared depressed, and she was tearful during the interview. (R. at 293.) Burke again encouraged coping strategies, and she encouraged Rice to continue her medications as prescribed. (R. at 293.) When Rice again saw Collins on December 8, 2008, she was oriented with normal memory, mood, affect and insight/judgment. (R. at 301-03.) Collins diagnosed anxiety, depression and insomnia. (R. at 303.)

On May 19, 2009, Burke noted that Rice had canceled her previous one or two appointments due to being busy taking care of her husband, who had gone into renal failure. (R. at 313.) Rice reported being fearful for his life. (R. at 313.) She reported crying almost daily despite taking BuSpar and Lexapro. (R. at 313.) She reported financial difficulties and sleep difficulties, but she denied any suicidal ideations. (R. at 313.) Rice appeared alert and oriented with appropriate grooming and hygiene. (R. at 313.) She was tearful throughout the interview. (R. at 313.) Burke noted Rice's continued multiple situational and family stressors and her difficulty coping with them. (R. at 313.) She further noted Rice's depression and anxiety, and she encouraged more frequent appointments. (R. at 313.) Burke encouraged Rice to take her medications as prescribed. (R. at 313.)

Burke completed another Assessment Of Ability To Do Work-Related

Activities (Mental) of Rice on July 29, 2009, finding that she had a fair ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed and complex job instructions and to behave in an emotionally stable manner. (R. at 310-12.) Burke further found that Rice had a good ability to understand, remember and carry out simple job instructions, to maintain personal appearance, to relate predictably in social situations and to demonstrate reliability. (R. at 310-11.) Burke based these findings on Rice's depression and anxiety. (R. at 310.) She found that Rice could manage benefits in her own best interest and that she would miss more than two work days monthly. (R. at 312.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2010).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2011); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Rice argues that the ALJ erred by failing to find that she suffered from a severe mental impairment. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-10.) Rice further argues that the ALJ did not comply with 20 C.F.R. § 404.1520a in evaluating her mental impairments. (Plaintiff's Brief at 11.) Finally, Rice argues that the ALJ failed to meet her burden of identifying other work consistent with her age, education, work experience and mental and physical capacities existing in significant numbers in the national economy that she could perform. (Plaintiff's Brief at 11-13.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997)

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if she sufficiently explains her rationale and if the record supports her findings.

The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2010). With regard to mental functioning, basic work activities include understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1521(b) (2010). The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

Here, the ALJ specifically found that Rice did not suffer from any severe mental impairment. (R. at 14.) In reaching this conclusion, the ALJ recites the

opinions of Ramsden and Burke. Nonetheless, the court cannot determine what, if any weight she attributed to them. (R. at 14-15.)

According to Ramsden, Burke suffered from an adjustment disorder with mixed features of anxiety and depression and an anxiety disorder with panic symptoms. (R. at 262.) Ramsden opined that Rice had a fair ability to deal with the public, to use judgment, to function independently, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 263-64.) A "fair" ability is defined on the assessment form as having a seriously limited ability to function. (R. at 263.) Ramsden further found that Rice had a poor ability to deal with work stresses. (R. at 263.) A "poor" ability is defined on the assessment form as having no useful ability to function. (R. at 263.)

Likewise, Burke found that Rice had a fair ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration, to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 271-72.) Burke also found that Rice had a poor ability to deal with work stresses and to understand, remember and carry out both detailed and complex job instructions. (R. at 271-72.)

Moreover, Ramsden placed Rice's GAF score at 50 in October 2007, and he placed it at 45 in May 2008. (R. at 262, 282.) Thus, both Ramsden and Burke

found that Rice's mental impairments would significantly limit her ability to perform basic work activities, as they would have more than a minimal effect on her ability to work. I also note, without discussing in detail, that the medical records from Ramsden and Burke submitted to the Appeals Council lend additional support to a finding that Rice suffered from a severe mental impairment on or before her date last insured.

As stated above, however, the ALJ did not specify what weight she was according to Ramsden's and Burke's opinions that she had before her at the time of her decision. It is clear that she did not accept either opinion in its entirety, given the fact that she stated that she was merely giving Rice the benefit of the doubt by limiting her to simple, routine, unskilled, repetitive light work that required no more than occasional interaction with the general public. I find two problems with the ALJ's approach. First, as stated above, in determining whether substantial evidence supports the ALJ's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). Here, while the ALJ noted the assessments and evaluations by Ramsden and Burke, she did not state what weight she was according to them, instead merely stating that she was giving Rice the benefit of the doubt by limiting her as noted above. "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously

probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Second, I find that because the only records from treating or examining mental health sources contained in the record are those of Ramsden and Burke, by failing to explicitly state the weight given to each opinion, and by apparently rejecting the majority of both opinions, instead giving Rice the benefit of the doubt by imposing certain limitations in the residual functional capacity finding, the ALJ improperly substituted her judgment for that of trained mental health professionals. "In the absence of any psychiatric or psychological evidence to support [her] position, the ALJ simply does not possess the competency to substitute [her] views on the severity of plaintiff's psychiatric problems for that of a trained professional." *See Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain,* 715 F.2d at 869; *Oppenheim*, 495 F.2d at 397).

It is for all of these reasons that I find that substantial evidence does not support the ALJ's finding that Rice did not suffer from a severe mental impairment on or before her date last insured. I further find that the ALJ's mental residual functional capacity finding is not supported by substantial evidence, nor is the ALJ's finding that Rice could perform jobs existing in significant numbers in the national economy.

# PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence does not exist to support the Commissioner's finding that Rice did not suffer from a severe mental impairment on or before her date last insured;

2.  Substantial evidence does not exist to support the Commissioner's mental residual functional capacity finding;

3.  Substantial evidence does not exist to support the Commissioner's finding that Rice can perform jobs existing in significant numbers in the national economy; and

4.  Substantial evidence does not exist to support the Commissioner's finding that Rice was not disabled under the Act and was not entitled to DIB benefits at any time on or prior to her date last insured.

# RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Rice's and the Commissioner's motions for summary judgment, vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration of Rice's mental impairments and their effect on her ability to perform substantial gainful activity.

# Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. §

636(b)(1)(C) (West 2006 & Supp. 2011):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      July 18, 2011.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE